# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA et al.,<br><br>　　　　　　Plaintiffs,<br><br>　vs.<br><br>WALKER RIVER IRRIGATION DISTRICT et al.,<br><br>　　　　　　Defendants. | 3:73-cv-00128-RCJ-WGC<br><br>In Equity No. C-125-C<br><br>**ORDER** |

　　　　This case is "Sub-file" C in Case In Equity No. C-125 (the "C-125 Case").[1] Mineral County seeks a further amendment of the Decree entered in the C-125 Case in 1936, as amended, in order to increase the flow of water to Walker Lake. The Court has granted petitions for Mineral County to intervene in this subfile and another. For the reasons given herein, the Court grants the Motion to Dismiss (ECF No. 751) the Amended Complaint in Intervention ("ACI")

---

[1] The case numbers in these cases will appear unorthodox to the reader for several reasons. First, the C-125 Case was filed in 1924 before the federal merger of law and equity upon the adoption of the Federal Rules of Civil Procedure in 1937; hence, the case name "In Equity No. C-125." *See* Fed. R. Civ. P. 2. Second, the present sub-file, although created after the merger of law and equity, is referred to as Case In Equity No. C-125-C, because it is the third of three separate cases created by Judge Reed in the 1990s in order to administer motions or claims by parties or intervenors relating to the existing Decree, as amended, in the C-125 Case. Third, the C-125 Case, as well as sub-files C-125-A, C-125-B, and C-125-C, have had contemporary case numbers assigned to them: 3:73-cv-125, 3:73-cv-126, 3:73-cv-127, and 3:73-cv-128, respectively. The sub-files therefore have their own administrative existence in the contemporary CM/ECF electronic docketing system. Although the sub-files were created in 1991, 1992, and 1995, respectively, they were assigned modern case numbers sequential to that of the C-125 case, i.e., 3:73-cv-125 *et seq.* It is not clear to the Court (or the Clerk) why the cases were assigned their modern case numbers as if they had been filed in 1973.

(ECF No. 20).

I.   **FACTS AND PROCEDURAL HISTORY**[2]

   A.   **Facts**

The Walker River Basin is approximately 4050 square miles in area. The basin stretches in a northeasterly direction from its origins in the southwestern elevations of the Sierra Nevada Mountains to its terminus, Walker Lake. Between the headwaters of the Walker River in Mono County, California, and its terminus at Walker Lake in Mineral County, Nevada, the Walker River Basin includes portions of Nevada's Douglas, Lyon, and Churchill Counties. Approximately 25% of the Walker River Basin lies within California, and this portion of the basin accounts for the majority of the precipitation feeding the system and is the primary source of the basin's surface water flows. On the other hand, the vast majority of consumptive water use within the basin and loss through evaporation from surface waters takes place in Nevada. The basin's principal agricultural water use occurs in the Bridgeport and Antelope Valleys in Mono County, California and in the Smith and Mason Valleys in Lyon County, Nevada.

The Walker River system consists of two forks, the West Walker River and the East Walker River. The West Walker River has its origins below the divide that separates the Walker River Basin from Yosemite National Park. From its origin, the West Walker River flows north through Leavitt Meadow and into Antelope Valley. Before reaching Nevada, water from the West Walker River is partially diverted into Topaz Reservoir for storage.[3] The East Walker River is fed by waters in the high Sierras north of Mono Lake. Water draining from Virginia

---

[2] The Court has borrowed most of the background information herein from *Mineral County v. Nevada*, 20 P.3d 800 (Nev. 2001).

[3] Topaz Reservoir, which straddles the California–Nevada border, was constructed in 1922 by WRID, which was organized by irrigation users in the Smith and Mason Valleys in 1919 and which provides surface and storage water rights for approximately 80,000 acres of agricultural land located primarily in the Smith and Mason Valleys in Lyon County, Nevada.

Lakes flows north and joins with water from Green, Robinson, Summers, and Buckeye Creeks. These flows are impounded at Bridgeport Reservoir.[4] The two forks meet approximately seven miles upstream from Yerington, Nevada at the south end of Mason Valley. The river flows further north before turning south, entering the Walker River Paiute Indian Reservation (the "Reservation"), flowing through Campbell Valley, and entering Weber Reservoir.[5] From Weber Reservoir, it continues south for approximately twenty-one miles before entering Walker Lake.

Walker Lake is a remnant of the Pleistocene Lake Lahontan that covered much of northern Nevada. As the climate dried, Lake Lahontan receded and many closed valleys became isolated dry lakebeds. However, several major rivers draining from the eastern slopes of the Sierras continued to support lakes and wetlands in some of these closed valleys, including present day Walker Lake. *See* D.K. Grayson, *The Desert's Past: A Natural Prehistory of the Great Basin* (Smithsonian Institution Press, 1993). Walker Lake is a "terminal lake," meaning there is no outflow from the lake and all surface runoff terminates in the lake. Walker Lake is approximately thirteen miles long, just over five miles wide, approximately ninety feet deep, and contains approximately two million acre-feet[6] of water. The shores of Walker Lake are almost entirely devoid of major plant growth, due in part to the extreme fluctuations in water level. The waters of Walker Lake are characterized by high concentrations of total dissolved solids ("TDS") consisting mainly of salts, high temperatures, low dissolved oxygen, and the presence of hydrogen sulfide. The lake also tends to support large blooms of planktonic blue-green algae,

---

[4] WRID constructed Bridgeport Reservoir in 1923 to provide storage for downstream users.

[5] Weber Reservoir was constructed on the Reservation by the United States for the benefit of the Walker River Paiute Indian Tribe (the "Tribe"). This is the only reservoir on the main stem of the Walker River.

[6] An acre-foot is an agricultural unit of measurement equal to a volume of water with an area of one acre and a depth of one foot. A square covering an acre of area is just under seventy yards on a side. An acre-foot of volume is just under one-third of a million gallons.

which, when combined with the high TDS concentrations and low dissolved oxygen, create an inhospitable environment for fish.

The causes of Walker Lake's low water level are disputed. Due to the highly variable hydrology of the Walker River Basin, Walker River has rarely produced "average" inflows to Walker Lake. It is not disputed that Walker Lake currently has less water than it had when initial recordings were taken in 1882. As of March 1996, Walker Lake had only 50% of its 1882 surface area and 28% of its 1882 volume. The situation has declined since then. The ultimate cause of the decline is potentially attributable to a number of factors, including, but not limited to, overconsumption, declining precipitation levels, and natural lake recession over time. In November 1994, Public Resource Associates, a public interest group concerned with the protection of Walker Lake, prepared a report describing the status of the lake and its wildlife. The report indicated that Walker Lake supports a fragile balance of algae, zooplankton, small crustaceans, insects, and three endemic fish species: the tui chub, Lahontan cutthroat trout, and Tahoe sucker. Walker Lake is also an important habitat for a wide variety of migratory birds.

**B.     Procedural History**

The Walker River and its tributaries in the Walker River Basin have been the object of litigation for over a century. In 1902, Miller & Lux, a cattle and land company, brought an action in this Court against Thomas Rickey and others to enjoin interference with Miller & Lux's use of the Walker River, and in October 1904, Rickey Land & Cattle Co. began two actions in a California state court against Miller & Lux to establish its prior right to waters on the East and West Walker Rivers. *See Rickey Land & Cattle Co. v. Miller & Lux*, 218 U.S. 258 (1910) (Holmes, J.); *Miller & Lux v. Rickey*, 146 F. 574 (C.C.D. Nev. 1906) (Hawley, J.); *Miller & Lux v. Rickey*, 127 F. 573 (C.C.D. Nev. 1904) (Hawley, J.). In 1906, Miller & Lux and other defendants sought to enjoin the proceedings in the California actions on the grounds that this Court had acquired prior exclusive jurisdiction. The Supreme Court agreed and enjoined the

1  California actions. *See Rickey Land & Cattle Co.*, 218 U.S. at 258.  The Court entered a final
2  decree in 1919. *See Pac. Livestock Co. v. Thomas Rickey*, No. 731, Final Decree (D. Nev. 1919).
3        In 1924, the United States brought a case in this Court, In Equity No. C-125, No. 3:73-cv-
4  125, seeking to establish water rights for the Reservation and to settle all surface water rights on
5  the Walker River system.  This litigation resulted in the 1936 Decree by Judge St. Sure, and the
6  Decree was subsequently amended to conform to the Court of Appeals's ruling that the
7  Department of the Interior's creation of the Reservation in 1859 impliedly reserved waters for the
8  Tribe despite the lack of any treaty making an express reservation.  The Decree formalized the
9  ownership of surface water rights from the Walker River that had been acquired pursuant to
10 Nevada's common law doctrine of prior appropriation.  It did not address groundwater rights.
11 The Decree created the Walker River Commission and the United States Board of Water
12 Commissioners (the "Board"), members of which were appointed by the Court to administer the
13 Decree.
14       In September 1987, the Tribe sought to intervene in the C-125 Case to establish rules and
15 regulations concerning applications to change the allocation of water rights subject to the Decree.
16 Judge Reed granted the motion to intervene on March 2, 1988; as a result, the Nevada State
17 Engineer is now required to review change applications, subject to this Court's approval pursuant
18 to its continuing jurisdiction over the waters of the Walker River Basin.
19       In 1991, the California State Water Resources Control Board (the "California Water
20 Board") issued restrictions on water licenses held by WRID, requiring it to maintain minimum
21 flows and pools in its reservoirs.  As a result of the decision, WRID filed a petition for
22 declaratory and injunctive relief in the C-125 Case.  Judge Reed designated the motion as Sub-
23 file C-125-A, No. 3:73-cv-126.  The Tribe served an answer, counterclaim, and cross-claim.  In
24 1992, the United States filed a motion for leave to file a counterclaim, which Judge Reed
25 designated as Sub-file C-125-B, No. 3:73-cv-127.  The counterclaims seek recognition of a right

to store water in Weber Reservoir for use on lands of the Reservation—which the Tribe has been doing while the motions remain pending—as well as an implied federal reserved water right for water to serve lands added to the Reservation in 1936.

On October 25, 1994, Mineral County filed a motion to intervene in the C-125 Case. Judge Reed designated the motion as Sub-file C-125-C, No. 3:73-cv-128. That is the present case. Mineral County argues that because Walker Lake is held in trust by the State of Nevada pursuant to Nevada's public trust doctrine, the Decree should be amended to adjust the priority of appropriation in the Walker River Basin to aid Walker Lake. In its prayer for relief, Mineral County asks that the Court modify the Decree by: (1) recognizing the rights of Mineral County to have minimum levels in Walker Lake; (2) ordering the State of Nevada to grant a certificate to Mineral County for the benefit of Walker Lake; and (3) recognizing that minimum flows are necessary to maintain Walker Lake as a "beneficial use and in the public interest and required under the doctrine of maintenance of the public trust."

## II.     DISCUSSION

### A.     Standing

The Court granted the motion to intervene, but it is not clear Mineral County has standing to assert the public trust doctrine, and it does not appear to assert its own right to the waters of the Walker River Basin. The Idaho Supreme Court has ruled that a state statute providing county prosecutors with the duty to "prosecute or defend all actions, applications or motions, civil or criminal, in the district court of his county in which the people, or the state, or the county, are interested" provides county prosecutors with standing to assert the public's right to recreation on private land. *See State ex rel. Haman v. Fox*, 594 P.2d 1093, 1096 (Idaho 1979) (quoting I.C. § 31-2604(1) (1976)). Because municipalities are not sovereign, however, absent such a statute explicitly providing standing, they cannot bring *parens patriae* suits on behalf of their residents. *United States v. City of Pittsburg, California*, 661 F.2d 783, 786–87 (9th Cir. 1981) (citing *In Re*

*Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir.), *cert. denied sub nom. Morgan v. Automobile Manufacturers Ass'n, Inc.*, 414 U.S. 1045 (1973)) ("Here, the City of Pittsburg can assert no right of its own that is violated as a result of the postal carriers' lawn crossing.  Nor may the City of Pittsburg base standing upon a parens patriae theory.  Although cities may 'sue to vindicate such of their own proprietary interests as might be congruent with the interests of their inhabitants,' only the states and the federal government may sue as parens patriae."); *Clark Cnty. v. City of Las Vegas*, 574 P.2d 1013, 1014 n.1 (Nev. 1978); *see also Coldsprings Twp. v. Kalkaska Cnty. Zoning Bd. of Appeals*, 755 N.W.2d 553, 556–57 (Ct. App. Mich. 2008); *Cnty. of Lexington, S.C. v. City of Columbia*, 400 S.E.2d 146, 147 (S.C. 1991) ("Generally, a county has the power to sue and be sued as a political body.  As a political subdivision of the State, however, it lacks the sovereignty to maintain a suit under the doctrine of *parens patriae*." (citation omitted)).  Mineral County can identify no statute granting it standing to sue to vindicate the public trust.  Chapter 252 of the Nevada Revised Statutes governing district attorneys indicates no such duty or authority.

Members of the public themselves have standing to sue to vindicate the public trust in the water rights context, *see Marks v. Whitney*, 98 Cal. Rptr. 790, 797–98 (1971) (en banc), but no citizens of the State of Nevada seek to intervene here.  Although the State of Nevada or any of its citizens would have standing to sue pursuant to the public trust doctrine in this case, Mineral County does not have standing to sue pursuant to the public trust doctrine.  It would presumably have standing to sue to vindicate its own rights as a user of water, but it does not appear to seek to protect any of its own water rights.  Indeed, in its response to the Nevada Department of Wildlife's and WRID's motions to dismiss in the C-125-B case, Mineral County expressly disclaimed any such interest, noting that its claim was based purely on a *parens patriae* theory. (*See* Resp. to Mots. to Dismiss 13–14, ECF No. 2186 in Case No. 3:73-cv-127 ("Mineral County has made it clear that its public trust claim is not tantamount to a request for a new priority water

right on the Walker River system, but rather a request for the enforcement of the public trust duty . . . .)). Mineral County has no standing to assert such a claim, and the Court can dismiss the ACI for that reason alone. Still, the Court will address the merits of the claim.

### B. The ACI

WRID asks the Court to dismiss the ACI because: (1) the Court did not via the Decree retain jurisdiction to adjudicate new water rights; (2) the adjudication of new water rights does not independently arise out of federal law, but state law; and (3) even assuming the ACI is properly within the scope of the Court's continuing jurisdiction under the Decree to modify the rights adjudicated thereunder, the Court should abstain under *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959) until WRID can obtain a ruling from the Nevada Supreme Court on the relationship between the public trust doctrine and the appropriative water rights system. The Court grants the motion to dismiss. Even assuming for the sake of argument both that Mineral County has standing to assert the public trust doctrine in the present case and that the Court has jurisdiction under the Decree to grant Mineral County the relief it requests, i.e., a modification of the Decree, the Court finds that the Takings Clause would prevent the Court from modifying the Decree in the way Mineral County requests. Abstention is inappropriate, not only because WRID has not identified any pending state court case in which an authoritative ruling might issue, but also because a ruling that private water rights in non-navigable water sources could be impaired without compensation in order to aid public trust waters would be inconsistent with the federal Constitution, at least in Nevada.

#### 1. Nevada's Adoption of the Public Trust Doctrine

"Generally, under the public trust doctrine, a state holds the banks and beds of navigable waterways in trust for the public and subject to restraints on alienability." *Lawrence v. Clark Cnty.*, 254 P.3d 606, 607 (Nev. 2011). The *Lawrence* Court expressly adopted the public trust doctrine for the State of Nevada. *See id.* In that case, the Nevada State Land Registrar, Mr.

Lawrence, had deeded land located in the Mohave Valley to Clark County but had refused to transfer approximately 330 acres of land over which he had control; he believed such transfer would violate the public trust doctrine because the 330 acres at issue might have been submerged below a navigable waterway at the time of statehood (October 31, 1864), making it subject to the public trust regardless of its current navigability. *See id.* at 608. On appeal, the Nevada Supreme Court adopted the public trust doctrine and remanded for further fact-finding. *See id.* In so ruling, the Court recounted the history of the public trust doctrine and noted that the U.S. Supreme Court had held that the States hold title to the navigable waters within their boundaries, including the lands beneath them, and that title to these waters and lands is not freely alienable by the States but is held in trust for use by the States' citizens. *See id.* at 609 (citing *Ill. Cent. R.R. v. Illinois*, 146 U.S. 387, 434, 452–53 (1892)). The Court then recounted three of its own previous cases applying, but not expressly adopting, the public trust doctrine.[7] The Court went on to note that the public trust doctrine is a limitation upon what the State of Nevada may do with the

---

[7] The third of these previous cases was *Mineral County v. Nevada ex rel. Department of Conservation and Natural Resources*, 20 P.3d 800 (Nev. 2001). In *Mineral County*, Mineral County had sued the Nevada Department of Conservation and Natural Resources to prohibit the further granting of groundwater or surface water rights that would affect the level of Walker Lake contrary to the State's duty to preserve the level of the lake under the public trust doctrine. *See id.* at 801. In *Mineral County*, the Court recounted the century-long history of the federal litigation over the waters of the Walker River Basin, including the present case. *See id.* at 239–41. The Court ultimately declined jurisdiction under the prior exclusive jurisdiction doctrine because of this Court's continuing *in rem* jurisdiction over the interstate Walker River Basin. *See id.* at 806–07 & nn.26–28 (citing *Nevada v. United States*, 463 U.S. 110, 143–44 (1983); *Kline v. Burke Constr. Co.*, 260 U.S. 226, 229 (1922); *Bergeron v. Loeb*, 675 P.2d 397, 400 (Nev. 1984); *Application of Filippini*, 202 P.2d 535, 537 (Nev. 1949)).
    Two justices further addressed the public trust doctrine in concurrence. *See id.* at 807 (Rose, J., concurring). That concurrence, however, is not authoritative, and because neither Justice joining it remains on the Court, it also has little predictive value as a practical matter. The concurrence's citation to a California case ruling that the public trust doctrine is implicated by a diversion of water from a non-navigable waterway that affects a navigable waterway, is therefore no more persuasive than is the California Supreme Court's opinion itself. *See id.* at 808 (citing *Nat'l Audubon Soc'y v. Superior Court*, 658 P.2d 709, 719 (Cal. 1983) (en banc)).

waters it holds in trust for the People. *See id.* at 613.

## 2. Nevada's Choice Whether to Adopt the Public Trust Doctrine

The Court notes that although the Nevada Supreme Court was free to adopt the public trust doctrine, and this Court must apply that doctrine as adopted by the Nevada Supreme Court, it was in no way bound to adopt or respect such a doctrine under federal law. The Court will dedicate a section of the opinion to this discussion, because it appears that the *Lawrence* Court may have been under the mistaken impression that it had no choice but to respect the doctrine under federal law. But that is not the case.

The relevant holding of *Illinois Central Railroad* did not rest upon any federal constitutional or statutory command, but was based purely upon the U.S. Supreme Court's application of what was previously known as the "federal general common law"—not the common law as to federal issues, but rather the notion that the law to be applied to state common law claims in diversity cases should be derived from a federal court's sense of the prevailing rules in the American (and even English) courts. *See generally Ill. Cent. R.R.*, 146 U.S. 387. *Illinois Central Railroad* was a state law quiet title action that was only removable to federal court (under the case law of the time) because the defendant railroad asserted federal constitutional defenses under the Due Process and Contract Clauses, not because the plaintiff asserted any federal claims. *See People of State of Ill. ex rel. McCartney v. Ill. Cent. R.R.*, 16 F. 881, 886–87 (C.C.N.D. Ill. 1883) (Harlan, J.). Federal jurisdiction over cases like *Illinois Central Railroad* has been unviable for over a century. *See Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908) (holding that a federal issue must appear on the face of the plaintiff's complaint for federal-question jurisdiction to lie, not only in the defendant's answer or anticipated answer). If a similar case were removed from the Cook County, Illinois Circuit Court today, the U.S. District Court for the Northern District of Illinois would have to remand it for lack of subject matter jurisdiction, *see id.*, and the case would only potentially receive review in a

federal forum upon the discretionary grant of a petition for a writ of certiorari by the U.S. Supreme Court, assuming the defendant railroad were to lose on a dispositive federal defense in the Illinois Supreme Court. *See* 28 U.S.C. § 1257. Substantively, the notion that a federal court may apply "federal general common law" to state law claims has long since been rejected by the Supreme Court; rather, federal courts must apply the common law of the state whose law controls the claim. *Erie R. Co. v. Thompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern. There is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a state whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts. And no clause in the Constitution purports to confer such a power upon the federal courts.").

In summary, *Illinois Central Railroad* is simply not binding upon the State of Nevada as to the public trust doctrine, but only as to the federal defenses therein asserted as against Nevada's own putative public trust doctrine. *See, e.g.*, *PPL Montana, LLC v. Montana*, 132 S. Ct. 1215, 1235 (2012) (noting that "the public trust doctrine remains a matter of state law"). As a diversity case, *Illinois Central Railroad* is not even binding on the State of Illinois as to the state law issue of the public trust doctrine, except as to the particular claims in that case. The State of Nevada remains totally free to adopt or reject the public trust doctrine as it sees fit, within the boundaries of the federal Constitution.

   **3.**  **The Effect of the Public Trust Doctrine upon Private Water Rights**

A trust duty imposed upon the State is just that: a duty upon the State to care for certain waters for the People's benefit. "The state is simply *without power* to dispose of public trust property when it is not in the public's interest." *Id.* (emphasis added). The doctrine is not,

however, a rule of prior appropriation granting the State a priority in any source of water that might benefit a body of water that it has a duty to protect under the public trust doctrine. The State presumably may under the public trust doctrine seek to maintain the level of Walker Lake as necessary for any legitimate benefit the public may derive from Walker Lake. But that is simply a matter of standing and trust duties signifying nothing as to whether the State's right to water from the Walker River Basin to service Walker Lake is prior to any other party's right to waters from the non-navigable waters that feed Walker Lake, which are themselves not public trust waters. "Determining whether land is held in trust for the public by the state begins by reference to whether the land was submerged beneath navigable water when Nevada joined the United States on October 31, 1864 . . . ." *Id.* at 614. The answer to that inquiry might help to define the scope of the State's duty to attempt to add to the levels of Walker Lake, i.e., the State may seek to restore the Lake to the level existing on that date. But its right to waters from the non-navigable waters of the Walker River Basin—or from any other non-navigable water source in the State the taking of which would diminish private rights to use the water, for that matter—to accomplish this goal is another matter entirely.

The State might be able to take private rights in non-navigable waters via re-prioritization or otherwise if the water is in fact to be put to public use, e.g., to increase the level of Walker Lake pursuant to the public trust doctrine, but such would be a taking requiring just compensation under either the federal or state constitutions. In the present context, the public trust doctrine would appear to create a substantive duty in the State to pursue available remedies to the extent necessary to preserve Walker Lake sufficiently to serve the purposes of the doctrine (i.e., boating, fishing, recreation, etc.), but the doctrine does not create a prior appropriation rule as to non-public-trust waters simply where the purpose of such appropriation is to serve public-trust waters. That kind of governmental action—the confiscation of private property for public use—is nothing new. The Founders called it what we call it today: a "taking." Had the State of

Nevada obtained a prior right to disputed water, whether under the common law or via the State Engineer's statutory certification process, the issue would be a simple matter of priority. But where a party's rights to use water from a water source that is not itself subject to the public trust doctrine have vested either under the common law or under the statutory scheme as administered by the State Engineer, and where the State later asserts the public trust doctrine to the detriment of those rights where the doctrine had not been previously announced either legislatively or judicially, and where such takings have historically been compensated under the Takings Clause, it is a confiscatory taking. And unlike the State's decisions whether to directly alienate property protected under the public trust doctrine, the State's discretionary decision whether to effect a taking against a private party in furtherance of the State's duties under the public trust doctrine is manifestly a political question into which this Court cannot delve.

In summary, the State may presumably take usufructory water rights for the public purpose of increasing the volume of Walker Lake to a level necessary to serve the purposes of the public trust doctrine, and the decision whether to do so is a non-justiciable political question.[8] But the public trust doctrine is not a prior appropriation rule. The public trust doctrine in Nevada indeed "operates simultaneously with the system of prior appropriation." *See Lawrence*, 254 P.3d at 611 (quoting *Mineral County*, 20 P.3d at 808). That is, the doctrine must be considered by the Nevada State Engineer when considering *further* appropriations of water. *See id.* ("It is then appropriate, if not our constitutional duty, to expressly reaffirm the engineer's continuing responsibility as a public trustee to allocate and supervise water rights so that the appropriations do not substantially impair the public interest in the lands and waters *remaining*." (quoting *Mineral County*, 20 P.3d at 808–09) (emphasis added; internal quotation marks omitted)). But

---

[8]The Court presumes that the State of Nevada may take private water rights to aid Walker Lake for the purposes of the federal Takings Clause, but the Court is aware that the Nevada Constitution guarantees a takings plaintiff the right to a jury determination of the antecedent "public use" issue.

1  nothing in the Nevada Supreme Court's opinions implies that the public trust can be used to
2  abrogate appropriative rights to the use of non-navigable waters that vested before the Court
3  announced the application of the doctrine in Nevada in 2011.  An application of that scope, as
4  apparently permitted in California under *National Audubon Society*, would raise serious
5  constitutional questions under both state and federal takings law that do not appear to have been
6  litigated in the California case.

### 4.   Compensability of Water Rights in Nevada Under the Takings Clause

Even assuming the Nevada Supreme Court had ruled that previously vested usufructory rights in non-navigable waters could be abrogated under the public trust doctrine, the takings issue would remain under both federal and state law.  Water rights are usufructary rights; one does not obtain title to the water. 9 Nichols on Eminent Domain § G34.05[1][a] (Matthew Bender, 3rd ed. 2009).  The right is to "use" the water, not to keep it.  One may retain the water only so long as reasonably necessary to put it to use, i.e., to divert it to its point of use with reasonable expeditiousness given the nature of the use.  But the fact that water rights are usufructory, and not possessory, does not mean that they are not concrete and need not be compensated when taken.  Indeed, the Nevada Supreme Court has ruled that water rights appurtenant to land may be condemned as "lesser estate[s] in real property" under Nevada Revised Statutes section 37.020(1), and that just compensation must be paid for such a taking, whether the value of the water rights are calculated separately from or together with the value of the fee simple estate itself. *See Dermody v. City of Reno*, 931 P.2d 1354, 1358–59 (Nev. 1997) (ruling that an action for compensation for the taking of water rights was precluded because the plaintiff had been compensated for the water rights contemporaneously with his compensation for the fee simple estate); *Carson City v. Lompa's Estate*, 501 P.2d 662, 662 (Nev. 1972) (ruling that because it is "a right which is regarded and protected as real property," a water right may be condemned). In *Carson City*, the parties had stipulated as to the value of the fee simple estate

and had argued the separate issue of the value of the water right to a jury. *See id.* "Nevada law is clear that appurtenant water rights are a separate stick in the bundle of rights attendant to real property. As such, they may be condemned separately." *Dermody*, 931 P.2d at 1358. And because the State recognizes water rights as compensable property rights, their condemnation must comply not only with Nevada's own Takings Clause, but with the federal Takings Clause, as well. *See Vandevere v. Lloyd*, 644 P.3d 957, 963 (9th Cir. 2011) ("[W]e look to state law to determine what property rights exist and therefore are subject to 'taking' under the Fifth Amendment.").

In summary, water rights in Nevada are property rights that may only be taken for public use and which must be justly compensated if taken, under both federal and state law. *See* U.S. Const. amends. V, XIV; Nev. Const art. I, § 8, cl. 6; *id.* art. I, § 22; *see also* 9 Nichols on Eminent Domain § G34.05[4][a] (collecting cases) ("The courts recognize that they cannot take away vested riparian, littoral, and appropriative water rights without just compensation."). Under a recent amendment to the Nevada Constitution, any water right holder against which the State of Nevada were to proceed in a condemnation action would have a right to a jury trial on the issue of "public use" and a right to an expectancy measure of compensation at the highest value of the property taken if the jury determined the public use issue in the State's favor. *See* Nev. Const. art. I, § 22, cls. 2–5.

Although the State of Nevada holds its navigable waters in public trust for its People, the State could not invoke the public trust doctrine to circumvent an express constitutional limitation upon its power to take the property of its citizens, which in Nevada includes vested rights to use water in non-navigable water sources. That appears to be the case in California, as well, even after *National Audubon Society*, i.e., water rights in California's non-navigable water sources appear to remain compensable. *See Casitas Mun. Water Dist. v. United States*, 102 Fed. Cl. 443, 457–49 (Fed. Cl. 2011) (citing *United States v. State Water Res. Control Bd.*, 227 Cal. Rptr. 161,

168 (Ct. App. 1986) ("It is equally axiomatic that once rights to use water are acquired, they become vested property rights.  As such, they cannot be infringed by others or taken by governmental action without due process and just compensation."), *aff'd* 708 F.3d 1340 (Fed. Cir. 2013)).  The *National Audubon Society* Court—a case upon which Mineral County heavily relies—ruled that although there might otherwise be a vested property interest in water rights in non-navigable water sources, where appropriation of such waters affected waters subject to the public trust, the State of California could impair the vested rights without compensation if necessary to aid public trust waters.  *See Nat'l Audubon Soc'y*, 658 P.2d at 723 (quoting *City of Berkeley v. Superior Court*, 606 P.2d 362 (Cal. 1980)) ("[We have] rejected the claim that establishment of the public trust constituted a taking of property for which compensation was required: 'We do not divest anyone of title to property; the consequence of our decision will be only that some landowners whose predecessors in interest acquired property under the 1870 act will, like the grantees in *California Fish*, hold it subject to the public trust.'  In summary, the foregoing cases amply demonstrate the continuing power of the state as administrator of the public trust, a power which extends to the revocation of previously granted rights or to the enforcement of the trust against lands long thought free of the trust." (citations omitted)).

Although the Court agrees that in Nevada, as in California, "[t]he public trust doctrine and the appropriative water rights system are parts of an integrated system of water law," *id.* at 732, the relationship between the public trust doctrine and the appropriative water rights system in Nevada only permits the doctrine to be used prospectively to prevent the granting of appropriative rights, not retroactively to divest them, *see Lawrence*, 254 P.3d at 611 (citing *Mineral County*, 20 P.3d at 808–09).

Although the prospective nature of Nevada's public trust doctrine insulates it against a takings problem, the Court notes that it strongly disagrees that vested appropriative rights could be taken without compensation in cases where the rights at issue have long been treated as

compensable upon a taking and only later been announced to be subject to the public trust doctrine.  A government's uncompensated confiscation of something from a citizen via a retroactive declaration that the traditionally recognized owner never "really" owned it would be a tyrannical maneuver the type of which the Founders were unfortunately all too aware and therefore prohibited via the Takings Clause.  If a right has always been understood to be precarious and subject to the government's whim, i.e., a mere privilege, such as the ability to enter a military base, then the withdrawal of that ability is not a compensable taking.  But a taking of a property right long understood to be compensable does not become a non-taking as soon as a state asserts a superior right to the property retroactively.  A state supreme court is presumably free to apply a retroactive view of the public trust doctrine making water rights in non-navigable waters that feed navigable waters (or perhaps even non-navigable waters generally) subject to a taking for a public use such as aiding public trust waters.  As noted, *supra* Part II.B.2, federal law has nothing to say about whether a state must adopt the public trust doctrine.  But a state may not avoid paying just compensation under the Takings Clause by applying a property rule retroactively.  The Supreme Court has pointedly disapproved such tactics both before and after *National Audubon Society*. *See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 130 S. Ct. 2592, 2601 (2010) (citing *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 163–65 (1980)) ("States effect a taking if they recharacterize as public property what was previously private property."); *see also United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 752–55 (1950) (holding that a 1928 amendment to the California Constitution reprioritizing water rights resulted in compensable takings) ("[B]y the Amendment California unintentionally destroyed and confiscated a recognized and adjudicated private property right . . . . The right of claimants at least to compensation prior to the Amendment was entirely clear.").

    A state supreme court's retroactive application of the public trust doctrine in derogation

of private rights in non-navigable water sources long treated as compensable for takings purposes would be the recharacterization of private property as public property. The Nevada Supreme Court first "recognized concepts foundational to the public trust doctrine" in 1970 and did not announce the doctrine itself until 2011. *See Lawrence*, 254 P.3d at 609–10 (citing *State Engineer v. Cowles Bros., Inc.*, 478 P.2d 159 (Nev. 1970)). But holders of appropriative water rights in non-navigable water sources in Nevada have had reasonable expectations of continued use of the waters without being subject to non-compensable takings by the State, whether under the public trust doctrine or otherwise, for a century before the Nevada Supreme Court "recognized concepts foundational to the public trust doctrine" in 1970—expectations long and consistently reinforced by the judicial enforcement of the requirement of just compensation for such takings in Nevada's own courts. *See, e.g.*, *Dermody*, 931 P.2d at 1358–59.

In summary, the State may presumably invoke the public trust doctrine to justify takings of water rights in the Walker River to aid Walker Lake, though just compensation must be paid therefor. And it is ultimately a non-justiciable political question whether the State wishes to satisfy its public trust duties by taking private property; a judicial command for a state to take property would be constitutionally problematic. *Stop the Beach Renourishment, Inc.*, 130 S. Ct. at 2613–15 (Kennedy, J., with Sotomayor, J., concurring) (citing *First English Evangelical Lutheran Church of Glendale v. L.A. Cnty.*, 482 U.S. 304, 321 (1987)) ("This is just one aspect of the exercise of the power to select what property to condemn and the responsibility to ensure that the taking makes financial sense from the State's point of view. And, as a matter of custom and practice, these are matters for the political branches—the legislature and the executive—not the courts. . . . If a judicial decision, as opposed to an act of the executive or the legislature, eliminates an established property right, the judgment could be set aside as a deprivation of

property without due process of law.").[9]  The State could also discharge its public trust duties by pumping or otherwise transporting water into Walker Lake, or even by desalinizing or otherwise treating the water in the lake, as that seems to be the heart of the matter, not overcrowding of recreational users due to the decrease in surface area.  Or the State could ignore the issue.  After all, the State has the political discretion to balance its public trust duties with other political concerns, and the balancing of those interests is a political consideration for the State's political branches.  *See id.*; *see also Nat'l Audubon Society*, 658 P.2d at 733–35. (Richardson, J., concurring in part and dissenting in part).  The Court will not purport to command the State of Nevada how to discharge its public trust duties.  Where a plaintiff asks a court to enjoin the transfer of public trust land or water itself, it is simple for a court to order a public official not to do so.  *See Lawrence*, 254 P.3d at 608.  But ordering affirmative measures in an area where there is so much political discretion as the taking of private property is not judicially feasible or appropriate.

Finally, as the Court has ruled in the C-125 case, Walker Lake is not within the "basin of the Walker River" as that phrase is used in the Decree, and the no export rule therefore prevents the intentional delivery of the waters of the basin of the Walker River for use in Walker Lake beyond the natural flow of water used within the basin.

The motion to dismiss is therefore granted.  Mineral County has no standing to assert the public trust doctrine, Nevada's public trust doctrine does not contemplate retroactive re-prioritization, retroactive re-prioritization would constitute a compensable taking under state and federal law, the Court will not command the State to enact such takings, and the purposeful delivery of water to Walker Lake from the waters of the basin of the Walker River would violate

---

[9]The State of Nevada probably could not take water rights in such a way as to adversely affect California users, i.e., it could not take waters from Nevada users beyond the rights Nevada users have as against California users under the Decree, because that would amount to an interstate taking from Californians.

the Decree.

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion to Dismiss (ECF No. 751) is GRANTED.

IT IS FURTHER ORDERED that the Clerk shall enter judgment and close the case.

IT IS SO ORDERED.

Dated this 28th day of May, 2015.

_____
ROBERT C. JONES
United States District Judge